**FEDERAL KEMPER INSURANCE COMPANY, Plaintiff,**

v.

**Roger WHEELER, Barbara Jo Wheeler, individually and as next friend for Timothy Wheeler and Jennifer Wheeler, infants, John Johnson, Administrator of the Estate of Linda Lenore Adkins, deceased, Rodney W. Johnson, individually and as next friend of Jeffrey A. Johnson, an infant under the age of 18 years, Tiffany D. Johnson, an infant under the age of 18 years, and Lori Adkins, an infant under the age of 18 years, who sues by and through her next friend, John Johnson, Thomas Adkins, Jr., individually and in his capacity as Guardian of Lori Adkins, Christina J. Harper, individually and as Guardian and next friend of Kristina R. Harper, an infant under the age of 18 years, American States Insurance Company, and Kentucky Central Insurance Company, Defendants.**

Civ. A. No. 2:91–0357.

United States District Court, S.D. West Virginia, Charleston Division.

March 10, 1992.

---

2. *Bradley* was also relied upon in *U.S. v. Mon-* santo, 858 F.2d 160, 175 (4th Cir.1988).

Milton T. Herndon and James W. Gabehart, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Charleston, W.Va., for plaintiff.

Michael T. Clifford, Charleston, W.Va., for Thomas Adkins, Jr.

Rodney W. Johnson and Thomas P. Maroney, Charleston, W.Va., for John Johnson.

John R. McGhee, Jr., Kay, Casto, Chaney, Love & Wise, Charleston, W.Va., for American States Ins. Co.

Deborah E. Haverty and Kathy Harman McQueen, McQueen Law Offices, L.C., Charleston, W.Va., for Kentucky Cent. Ins. Co.

Patrick B. Boggs, Charleston, W.Va., for Roger Wheeler and Barbara Jo Wheeler.

John T. Meisner, Hoyer, Hoyer & Smith, Charleston, W.Va., for Christina J. Harper.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

By motion for summary judgment Plaintiff seeks a declaratory ruling establishing the policy limits of underinsured motorist coverage on a 1983 Datsun Sentra owned by its insured, Homer Spinks.

On August 28, 1987, the insured vehicle was involved in an accident with an automobile operated by Wayne Casey and owned by his wife. Kristina R. Harper, Barbara Wheeler, Jennifer Wheeler, Timothy Wheeler, Linda Adkins, Lori Adkins, Jeffrey Johnson, Tiffany Johnson and Rodney Johnson were passengers in the Spinks vehicle. All these passengers or their personal representatives, Defendants in this lawsuit, have filed actions in the Circuit Court of Kanawha County, West Virginia, against the Caseys seeking damages for personal injuries resulting from the accident.

A liability insurance policy issued by Coronet Insurance Company to Mrs. Casey provided third party liability coverage limits in the amount of $20,000 per person, but not to exceed a total of $40,000 per accident to satisfy any and all claims made against the Caseys because of covered occurrences.

The automobile liability insurance policy on the insured vehicle was issued to Spinks by the Plaintiff, Federal Kemper Insurance Company, on February 13, 1987. The Federal Kemper policy provided third party liability coverage limits of $100,000 per person injured, not to exceed a total of $300,-000 for each accident. The policy also provided underinsured motorist limits of $20,-000 per person and $40,000 per accident.

Believing their recoverable damages from the tortfeasor Casey will far exceed the $20,000/$40,000 limits of the Coronet policy, the injured passengers of the Spinks vehicle intend to look to the underinsured motorist provision of the Federal Kemper policy as an additional source of funds to satisfy their potential recoveries.

This coverage dispute comes to the federal courts by way of the interpleader action

brought by Plaintiff pursuant to 28 U.S.C. § 1335 against the passengers and other potential claimants to obtain a declaratory judgment on the issue of underinsured coverage limits. Federal Kemper has paid into the registry of the Court the sum of $40,000, which it contends is the limit of its liability to Defendants. The Defendants, however, urge the Court to rule that Federal Kemper's exposure to underinsured motorist liability is $300,000 by operation of law and because of certain deficiencies of its agent's offer of this coverage to Mr. Spinks or because of Spinks' uninformed rejection of coverage equal to the limits of his liability coverage.

The events which provided the genesis of the limits of coverage question involve interpretation and application of controlling West Virginia insurance law to the contract of automobile liability insurance sold by Plaintiff's agent to Spinks.

With regard to the content of automobile liability policies, *W.Va.Code*, § 33–6–31(b), as amended, provides:

> "[t]hat such policy or contract shall provide an option to the insured with appropriately adjusted premiums to pay the insured all sums which he shall legally be entitled to recover as damages from the owner or operator of an uninsured or underinsured motor vehicle up to an amount not less than limits of bodily injury liability insurance and property damages liability insurance purchased by the insured without set off against the insured's policy or any other policy."

In a decision rendered after Spinks' policy was purchased, the Supreme Court of Appeals of West Virginia held the above language as requiring the insurer to offer the insured underinsured coverage "up to the dollar limits of the liability insurance purchased by the insured." *Bias v. Nationwide Mutual Ins. Co.*, 179 W.Va. 125, 365 S.E.2d 789, 790 (1987). Although recognizing that such underinsured coverage is optional, the West Virginia Court nevertheless held the burden of proof rests upon the insurer to establish the offer of coverage was made and that any rejection of coverage by the insured was knowing and informed. *Syllabus* pt. 1. *Bias, Id.*

Finally the Court held that when the insurer failed to meet the burden of proof, the optional coverage: underinsured coverage equal to the dollar limits of liability insurance purchased by the insured, is to be included in the policy by operation of law. *Bias, Id.* 365 S.E.2d at 791. So, with a recognition that the West Virginia court has imposed a heavy burden upon an insurer to negate underinsured coverage, the uncontroverted historical facts must be examined closely within the additional context of applicable summary judgment standards.

Where, as here, the party moving for summary judgment has the burden of persuasion on the issue at trial, its showing must sustain that burden as well as demonstrate the absence of a genuine dispute. Schwarzer, Hirsch & Barrons, *The Analysis and Decision of Summary Judgment Motions*, (F.J.C.1991). Thus it must satisfy the initial burden: that no genuine issue of fact remains extant, and the ultimate burden: that it would be entitled to a *judgment at law* at trial. (Emphasis supplied). *See* "new" *Rule* 52(c), Federal Rules of Civil Procedure (Amendment effective 12/1/91).

With these standards in mind, the Court finds the following operative facts to be uncontroverted. On April 17, 1985, Spinks contacted Patricia Knight Tate, his agent who sold Federal Kemper Insurance, to obtain automobile insurance on a 1979 Chevrolet Malibu. In their discussion, Mrs. Tate advised him of all coverages available, including underinsured motorist coverage. Mrs. Tate explained to Mr. Spinks what underinsured motorist coverage was and advised him of the premium cost for obtaining underinsured motorist coverage with $100,000/$300,000 limits, an amount equal to the liability coverage limits which Mr. Spinks selected. Mr. Spinks declined to purchase underinsured motorist coverage, and signed the application for insurance which contained the following language above his signature:

"I further certify that I have read all Uninsured and Underinsured Motorist Coverage options applicable to my state. I have selected or rejected such coverage as indicated. Any limits or coverages selected are shown on the reverse side of this application."

Federal Kemper then issued its policy to Mr. Spinks providing liability insurance with limits of $100,000/$300,000 on his 1979 Chevrolet Malibu. The policy furnished Mr. Spinks was accompanied by an additional page confirming Spinks' rejection of underinsured coverage.

Approximately two years later, on February 13, 1987, Mr. Spinks contacted Mrs. Tate and requested that a newly acquired vehicle, a 1983 Datsun Sentra, be added to his policy with Federal Kemper. Again, Mrs. Tate discussed with Mr. Spinks the coverages available and explained to him the optional underinsured motorist coverage. With the exception of Defendants Harper, the Defendants stipulate and admit that Mrs. Tate confirmed that Mr. Spinks understood underinsured motorist coverage, that she offered him the opportunity to purchase underinsured motorist coverage in an amount up to the $100,000/$300,000 limit he carried for liability, and that she advised him of the premium cost for such coverage.

Mr. Spinks decided to add underinsured motorist coverage to his policy with $20,000/$40,000 limits and, effective February 13, 1987, the policy was amended to add coverage for a 1983 Datsun Sentra with liability limits of $100,000/$300,000 in uninsured and underinsured coverage limits of $20,000/$40,000. This coverage was in effect on August 28, 1987, the date of the accident.

The Harper Defendants contend that it would be inappropriate for the Court to grant summary judgment and conclude that Spinks made a conscious deliberate choice to purchase $20,000/$40,000 underinsured motorist coverage after being effectively offered the option to purchase up to $100,000/$300,000 of underinsured coverage. The Harpers assert that because Mr. Spinks' deposition reflects that he lacks exact recollection to corroborate Mrs. Tate's testimony and the stipulation agreed to by all other parties, the Court must hear testimony, make credibility determinations, and then make a finding that Spinks did or did not decide to purchase underinsured coverage to lesser limits than his liability coverage.

Spinks' recollections are detailed in his responses at deposition:

"Q: Now, at the time you talked with Patty after purchasing the new company car, what did you tell her that you wanted with respect to insurance?

A: Well, that's a good one, too. Off the top of my head, Mike, I really couldn't tell you. I just—I wanted a little better than my regular coverage, I think, was a little better than the minimum. I can't remember exactly. I mean, I didn't sit down and come up—usually what I do is I go over the insurance, what's available, what I can get and this and that. She gives me all the options, and then I pick from there. And she makes recommendations or something like this and that.

\*   \*   \*   \*   \*   \*

Q: Do you recall what the options were that were explained to you that day?

A: No, I don't.

\*   \*   \*   \*   \*   \*

Q: I'm just trying to get it clear in my own mind. Do you really remember the conversation distinctly?

A: I remember talking about the insurance, yes.

Q: Do you remember having any questions, or did you ask her any questions at the time?

A: Uh-huh. I remember that. I remember talking about insurance and about switching cars and prices and a lot of different things. I can't remember figures, you know, it's been too many years ago.

\*   \*   \*   \*   \*   \*

Q: Did you receive any information regarding your coverage from Patty?

A: Yes, I did.

Q: And what would have comprised that information?

A: The policy.

\* \* \* \* \* \*

Q: Could you explain to me what uninsured coverage is for?

A: Well, uninsured coverage is for—you are talking about uninsured?

Q: Yes.

A: That's for someone who doesn't have any insurance, to cover your vehicle.

Q: And do you know what underinsured coverage is for?

A: Underinsured, yeah, is if someone doesn't have enough insurance to take care of it.

Q: And is that, in fact, what Ms. Tate explained to you?

A: Right.

\* \* \* \* \* \*

Q: Now I take it that you don't have any independent recollection exactly what was said when you added that car?

A: The only thing that I can remember is that we went over a lot of figures, and I do remember her talking about not having any underinsurance and that I ought to have that. And Patty kind of preaches. She goes on about what you need, and she's always gave me advice. See, I've worked in insurance myself some, so I know a little bit about it. So she's told me if she thinks I need extra coverage or if I need this. She just been basically pretty honest about it.

\* \* \* \* \* \*

Q: Correct me if I'm wrong, but it had underinsurance at $100,000?

A: I couldn't tell you the exact figure, Pat. I really couldn't. I remember—every time I get a policy, whether it be homeowners or a cancer policy or whatever, I go over it when I get the policy. But you are talking about four or five years ago, and I just don't remember exactly. I know I look at every policy.

\* \* \* \* \* \*

Q: Now, after having an opportunity to review those two documents, and there's a difference of just about $4.00 in the coverage between the 100/300 and the 20/40, the underinsured, would you have a recollection now that back in 1987, that you felt you had purchased from Federal Kemper a higher coverage amount than what is reflected on that sheet of paper?

A: I see what you are getting at, but if my memory serves me correct, after going over everything with Patty, I picked what I wanted. It's kind of hard to remember back. I couldn't say for sure, Pat. I really couldn't.

\* \* \* \* \* \*

Q: Now, for a person like yourself on the accident committee at work and familiar with vehicles and somewhat familiar with insurance from the standpoint of previously being involved in the insurance business, would it be your best recollection that you would have purchased more than the minimum underinsured/uninsurance coverage in 1987?

A: I see what you're saying, but I don't—Pat, I'm not really sure whether I would or—I usually go about the middle of the road ... but I am sure about one thing. I am sure—and it's not because I've known the lady for twenty years and she's been my agent and a good friend on top of that. It's hard to explain Patty. Patty goes over everything usually in pretty well detail, and she's always been like that. I mean, as far as being precise and going through everything. And I'm sure she's went

over things with me.... But I usually—I pick everything myself. Usually all the options are laid out in front of me, and I pick what I want. I usually don't let anybody pick my policies. I just usually pick it myself."

(Deposition of Homer Spinks, pp. 11–32).

Earlier in that same deposition, Mr. Spinks responded to the following questions:

"Q: And how did you go about switching that over to the new car?

A: I got in touch with Patty.

Q: So you went to the office to change the insurance policy?

A: I don't remember whether I went to the office first or called on the phone. That's what I can't remember. But I do remember going over the prices, and I remember I was going over what coverage and this and that. And she's the one that reminded me that I didn't have—I think on the Chevelle I didn't have any underinsurance coverage, and she reminded me, and I took out some on that. I had uninsured, but I don't think I had any underinsurance.

\* \* \* \* \* \*

Q: Now, did Patty tell you how much the insurance would be for this new car, the Datsun?

A: Yes. She always goes over the rates and everything with me.

Q: Do you recall what the cost was for the insurance?

A: I have two cars insured with them now, a '91 Lumina van and a '91 Chevy truck, so I just get all the rates and pick out what I want."

(*Id.* at 8–10).

This brief litany of questions and responses by Mr. Spinks is entirely consistent with the stipulation. Mr. Spinks' lack of recollection does not contradict Federal Kemper's apparent compliance with the statutory and case law requirements. Likewise, the deposition testimony given by Mrs. Tate is in accord:

"Q: Now if I can get back to this February telephone conversation, can you explain to me the nature of pitching him on purchasing this underinsurance coverage?

A: I recall telling Butch that he had no underinsured motorist at that time and that I highly suggested and offered it to him at the limits of his liability which was 100/300/50. Butch's response was 'put it on there, but just give me the minimum.'

Q: What did you interpret that to mean?

A: That I was going to give him the underinsured motorist at the state minimum 20/40/10.

\* \* \* \* \* \*

Q: Did you define for Butch what underinsurance is?

A: Yes, I explained the coverage underinsured motorist to him, specifically because he didn't have it."

(Deposition of Patricia Knight Tate, pp. 31–32)

Under *Rule* 56(c) of the Federal Rules of Civil Procedure, summary judgment shall be rendered:

"if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits on file, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

A principal purpose of summary judgment is to isolate and dispose of meritless litigation, *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). However, once the moving party has met its initial burden, the burden shifts to the nonmoving party to "establish the existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552. To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553.

By its terms, the *Rule* 56 standard enunciated recognizes that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis in original). Conversely, summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. Under *Rule* 56(e), a party opposing a properly supported motion for summary judgment

> " 'May not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.' *Id.* It is true that the issue of material fact required by *Rule* 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."

*Id.* at 249, 106 S.Ct. at 2510, quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288–289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). The Court has concluded that summary judgment is appropriate.

On the stipulated facts and deposition testimony, without making credibility determinations or weighing the evidence, and viewing it in the light most favorable to the Defendants, "through the prism of the substantive evidentiary burden," *Anderson, supra,* 477 U.S. at 254, 106 S.Ct. at 2513, the Court concludes that Federal Kemper complied with the statutory and case law requirements, in complete discharge of its obligations to inform Spinks of his option to purchase underinsured coverage. Mr. Spinks' lack of recollection later does not "present evidence from which a jury might return a verdict in [the Defendants'] favor." *Anderson, supra,* at 257, 106 S.Ct. at 2514. On this basis, the Court concludes that there is no genuine issue of material fact in dispute that requires a trial. As a matter of law Federal Kemper is entitled to judgment. Accordingly, the Court GRANTS Federal Kemper's motion for summary judgment and holds the underinsured motorist coverage limit on the insured vehicle available to the Defendant passengers is $40,000.